

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00285-CV

_____

IN THE INTEREST OF C.E., A CHILD

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. P2021009

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion on Remand by Justice Wallach

## MEMORANDUM OPINION ON REMAND

This court previously held that legally insufficient evidence supported terminating the parental rights of B.K. (Mother) to her son Carlo.[1] *In re C.E.* (*C.E. I*), 692 S.W.3d 486, 507, 512, 516, 517 (Tex. App.—Fort Worth 2023), *rev'd*, 687 S.W.3d 304 (Tex. 2024) (*C.E. II*). More specifically, we held that the evidence was legally insufficient to support the jury's findings on the termination grounds in Subsections (D), (E), and (O) of Texas Family Code Section 161.001(b)(1) and in Section 161.003. Because of our holding, we did not address Mother's arguments that factually insufficient evidence supported those findings. *Id.* at 507, 516, 517–18; *see Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019) (noting that if the evidence is legally insufficient, an appellate court ordinarily will not address factual sufficiency). We also did not address her arguments that legally and factually insufficient evidence supported the jury's best-interest finding and that the trial court erred by terminating under Section 161.003 because of the trial's timing. *C.E. I*, 692 S.W.3d at 517–18; *see* Tex. R. App. P. 47.1.

The Texas Supreme Court reversed, holding that legally sufficient evidence supported the jury's finding of endangerment under Subsection (E). *C.E. II*, 687 S.W.3d at 314. That court remanded the case to this court to consider the

---

[1]We use an alias to identify the child, and we identify the parents and other relatives by their relationship to him. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

arguments raised by Mother that had not been addressed in our prior opinion.[2] *Id.* Because factually sufficient evidence supports the jury's finding under Subsection (E) but does not support the finding that termination of Mother's parental rights was in Carlo's best interest, we will reverse.

## Background

Because we thoroughly discussed the trial evidence in our prior opinion, we set out here only a brief summary of the events that led to this appeal.

Carlo was born in January 2021. According to Carlo's father (Father), before Carlo's injury, Mother began showing mental strain, *C.E. I*, 692 S.W.3d at 495–96, but nevertheless, Father took no time off work while Mother was in labor or after Carlo's birth. As detailed in our prior opinion, Father wanted out of his relationship with Mother,[3] wanted custody of Carlo, and—at least according to text messages that he

---

[2]The Texas Supreme Court's opinion, which did not review our other holdings, instructed us to consider on remand Mother's arguments that we had not previously addressed. *See C.E. II*, 687 S.W.3d at 314. Accordingly, we will address the factual sufficiency of the evidence on the Subsection (E) ground and the legal and factual sufficiency of the evidence to support the best-interest finding. Because our holdings on those arguments are dispositive, we need not address Mother's second issue. *See* Tex. R. App. P. 47.1.

[3]The Department's brief points to the testimony of a Department investigator that at the beginning of the case, Father told the investigator that he was in love with Mother and that she was the love of his life. Father's own texts messages to his friends indicated that these statements were false. In February 2021, in the weeks before Carlo's injuries, Father was still telling Mother that he loved her, but in texts to a friend he called Mother "that bitch" and a "c[--]t" and stated that he was "done" with the relationship. *C.E. I*, 692 S.W.3d at 497–98. The Department does not address

sent to his friends—hoped that Mother would have a serious mental health crisis in order to improve his chance at sole custody. *C.E. I*, 692 S.W.3d at 497 (quoting, among other texts, Father's message stating, "I'm letting her take all the rope she wants, she will hang[ ]herself and end up in a psyc[h] ward long enough to give me a chance for custody"). Despite his apparent belief that Mother was on the verge of a breakdown, *id.* (noting Father's texts stating, among other things, that Mother was "going into crisis"), he continued to leave Mother alone for up to twelve hours a day as Carlo's primary caretaker. When an acquaintance, Krissy Burke, stopped by Father's veterinary clinic, Father told her that Mother was struggling and that he feared that she was going to harm Carlo.[4] But when Burke offered to go by the house to give Mother a hand, Father would not allow it. He also forbade Mother's father (Grandfather) from visiting the house.

---

or mention the texts messages. Father also texted his friends about speaking to an employment attorney about ending Mother's job with his clinic. *Id.*

[4]This testimony showed Father's belief that Mother was struggling and how that could potentially affect Carlo. The testimony was also consistent with the text messages that Father had sent to others. Not only was Father aware of her struggles, but he also appeared to be trying to seed in others the idea that Mother was mentally unstable. He told Burke that Mother was struggling and might harm Carlo, and at a February pediatric appointment that he attended without Mother, he told the pediatrician "at least twice" that Mother had gone to seek treatment for her mental health and that Mother had a history of mental health issues, a fact that Mother had already disclosed to the doctor. There was no evidence that Father's telling this information to the doctor was in the context of asking the doctor for resources to help Mother or to keep Carlo safe. To the contrary; the doctor testified that the only questions that Father asked were about feeding issues with Carlo.

4

In mid-February 2021, Mother began having increased anxiety because of her relationship with Father, which had begun to deteriorate, and she decided to seek out emergency mental health care. She anticipated that she might be hospitalized, but she was given medication and sent home. However, Mother also made an appointment with a psychiatrist for the morning of February 24, and she told the psychiatrist that the reason for the appointment was that she was "going into crisis." According to the psychiatrist, at that appointment, Mother was not erratic and was not in need of emergency psychiatric care.

Both parents testified that Carlo was fussy on the evening of February 24. Mother also testified that Carlo vomited in the early morning hours of February 25. Later that day, Mother took Carlo to his pediatrician after noticing that his leg was twitching. *Id.* at 502–03. The pediatrician was concerned that Carlo could be having a seizure, so she told Mother to take him to the hospital. *Id.* at 503. Examinations at the hospital revealed that Carlo had suffered a serious head injury. *C.E. II*, 687 S.W.3d at 307, 309. According to a nurse who testified at trial—and whose testimony we must accept, *see id.* at 309—the injuries were likely intentionally inflicted, *id.* at 312–13.

The Department of Family and Protective Services became involved and sought termination of Mother's parental rights. *Id.* at 308. Each parent also sought termination of the other parent's rights. The Department originally also sought termination of Father's parental rights, but it later dropped the termination ground that it had alleged against him. *Id.*

5

The case was tried to a jury. A nurse involved in Carlo's treatment testified that in a seven-week-old baby, it can be difficult to see when symptoms of a head injury begin; that "it could be possible that onset of symptoms [was] February 25th if that's when the seizures started," or it could have "been sometime on the 24th"; and that in any case, based on the scans of his brain, the injury happened in the week before he was brought into the hospital. Other testimony established that if the injuries had occurred on February 24 or February 25, then the person responsible was most likely one of his parents. Mother's trial theory was that Father had caused the injuries, while Father and the Department both asserted that Mother was responsible.

The Department and Father both emphasized Mother's mental health issues. They introduced evidence that several years before Carlo's birth, Mother had been hospitalized for a mental health issue, and Father repeatedly played for the jury a 2017 video that she had recorded and uploaded to Facebook shortly before the hospitalization. *See C.E. I.*, 692 S.W.3d at 493. In that very short video, Mother expressed her concern that the world was about to end and encouraged people to seek out their loved ones. *Id.* Mother's psychiatrist testified that the video appeared to show Mother having an episode of PTSD. *Id.* at 494.

The jury found that the termination grounds in Section 161.001(b)(1)(D), (E), and (O) and in Section 161.003 applied to Mother, and it found that termination of her parental rights was in Carlo's best interest. The jury also found the Subsection (E) ground as to Father but declined to find that terminating his parental rights was in

6

Carlo's best interest. The trial court then signed a judgment terminating Mother's parental rights.

## Standard of Review

In a termination case, the State (and in this case, the other parent) seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the terminated parent's favor. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination

7

proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.

To determine if evidence is legally sufficient under the clear and convincing standard, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). Although the trier of fact may draw inferences, those inferences must be reasonable and logical. *Z.N.*, 602 S.W.3d at 545. The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021).

In evaluating whether evidence is factually sufficient under the clear and convincing standard, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the challenged finding is true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If the factfinder could reasonably do so, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). But if not—because the disputed evidence that could not reasonably support the

finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. The factfinder is the sole judge of the witnesses' credibility and demeanor. *Id.*; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## Discussion

### I. Endangerment under Subsection (E) and Best-Interest Factors

Under Subsection (E), a trial court may terminate the parent–child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with someone who engaged in conduct that endangers the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" in this context "means to expose to loss or injury" or "to jeopardize." *J.F.-G.*, 627 S.W.3d at 312 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The term "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803 (quoting *Boyd*, 727 S.W.2d at 533). "As a general rule, conduct that subjects a child to a life of uncertainty and instability" endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Regarding a child's best interest, although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence

9

probative of a child's best interest may be the same evidence that is probative of a Section 161.001(b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors, listed in *Holley v. Adams*, that the factfinder may apply in determining the child's best interest. 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## II. Analysis

### A. Sufficient Evidence Supports the Subsection (E) Finding

The Supreme Court's opinion summarized the evidence that it found relevant to show endangerment under Subsection (E). *C.E. II*, 687 S.W.3d at 310–14. That summary focused primarily on evidence relating to who caused Carlo's injuries, and it included the following:

10

- according to the nurse who testified at trial, after he was injured, Carlo would have begun displaying symptoms like abnormal fussiness, vomiting, and irritability;[5]

- Father testified that when he arrived home on the evening of February 24, Carlo was abnormally fussy, and Mother also testified that Carlo was fussy that evening;

- Mother and Father were the only caregivers for Carlo on the evening of February 24;

---

[5]As noted, the nurse stated that with babies, it is impossible to pinpoint the specific time when a head injury occurred; that medical providers have to rely on the onset of the child's symptoms to determine the timing of a head injury because "at some point around that time" is when the child would have been injured; and that in a seven-week-old baby like Carlo, symptoms can be difficult to see at onset. The nurse then described some behaviors that would be consistent with the onset of symptoms of injury, including seizures, unusual fussiness, irritability, and vomiting, and she stated that Carlo's extra fussiness on February 24 could have indicated the onset of his symptoms. She also said that the symptoms could have begun on February 25 and that the injury could have occurred at any point in the week before he was brought to the hospital.

The Texas Supreme Court stated that the nurse "concluded that the injury likely occurred on February 24." *C.E. II*, 687 S.W.3d at 311. We have not located where in the record the nurse made that particular statement, but as we noted, the nurse did say that Carlo's fussiness on February 24 could have marked the onset of symptoms. Regardless of whether the nurse specifically said that the injury likely occurred on February 24, the jury could have concluded from her testimony and Mother's and Father's testimony about Carlo's fussiness on February 24 that the symptoms from his injuries began that day.

- neither parent provided a plausible explanation for Carlo's injuries, but over time, Father's version of the evening's events stayed more consistent than Mother's did; and

- the nurse testified that Carlo's injuries were likely intentional.

Because the Texas Supreme Court reviewed the legal sufficiency of the evidence to support the Subsection (E) finding, it viewed the evidence in the light most favorable to the verdict and disregarded all evidence contrary to the finding unless a reasonable factfinder could not have done so. *See id.* at 308 (considering legal sufficiency of the evidence); *K.E.W.*, 315 S.W.3d at 20 (setting out the legal sufficiency standard). In our factual sufficiency review, however, we must consider the entire record. *See C.H.*, 89 S.W.3d at 28.

Mother produced no evidence to contradict the nurse's testimony about the symptoms of a head injury like the one Carlo suffered or about the likely time frame for the injuries. She also produced no evidence to contradict the nurse's testimony that Carlo's injuries were likely caused intentionally. Mother and Father were the only people who cared for Carlo on February 24, except for a brief period when Grandfather cared for him earlier in the day, and thus only Mother and Father could say what happened to cause the injuries.[6] If the jury accepted the nurse's testimony—

---

[6]The record shows that Carlo and Grandfather were alone in a car together while Mother had her appointment with her psychiatrist. *C.E. I*, 692 S.W.3d at 499.

12

and it apparently did—and if it determined that Carlo's symptoms on February 24 meant that the injury occurred that day, then the jury had to decide what version of that day's events it found credible.[7] *See H.R.M.*, 209 S.W.3d at 108 (noting that the factfinder is the sole judge of a witness's credibility); *In re J.M.H.*, No. 04-14-00471-CV, 2014 WL 6687237, at *6 (Tex. App.—San Antonio Nov. 26, 2014, no pet.) (mem. op.) (stating that "[g]iven the 'he said—she said' nature of the evidence, . . . the issue was one of credibility" and therefore within the province of the factfinder).

Mother testified that Carlo screamed during the night of February 24 while in Father's care and that Carlo later began vomiting, *C.E. II*, 687 S.W.3d at 312, while Father testified that by the time he arrived home on that evening, Carlo was already acting more fussy than usual, *id.* at 311. The jury was presented with evidence of concerning behavior by Father, as noted above, *see C.E. I*, 692 S.W.3d at 497–98, but the jury also heard evidence about questionable behavior by Mother, *see, e.g., id.* at 506, 515 (noting evidence that Mother had given a private investigator the address of Carlo's foster family to have him go by the house, had talked to the investigator about going to the caseworker's house, and had sent Carlo's attorney ad litem over twenty

---

However, he was not around Carlo in the late afternoon or evening of February 24, and neither Mother nor Father believed that he was responsible for Carlo's injuries.

[7]The Texas Supreme Court also pointed out that Mother accused Father of "attacking" Carlo but did not provide any support for her contention that Father had caused the injuries. *C.E. II*, 687 S.W.3d at 313. However, as the court noted, Father also could not provide any explanation for what happened to Carlo. *See id.* at 312.

hostile emails during the first several days of trial). Father's story stayed consistent over time, while Mother's varied somewhat. *C.E. II*, 687 S.W.3d at 313 (noting, for example, that Mother did not initially mention to anyone that Carlo had screamed that evening). The jury was entitled to determine that despite the evidence of Father's own endangering conduct, his testimony that he did not cause Carlo's injuries was more credible than Mother's and thus that Mother must have been responsible. *See H.R.M.*, 209 S.W.3d at 108.

Termination under Subsection (E) generally requires a course of conduct rather than one individual act. *See In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *21 (Tex. App.—Fort Worth Dec. 30, 2021, pet. denied) (mem. op.). Here, in addition to the testimony about the cause of Carlo's injuries, the jury also heard evidence that Mother had accused Father of causing Carlo's injuries. *See C.E. II*, 687 S.W.3d at 313. Mother continued to make that accusation at trial and denied being the cause of Carlo's injuries. *Id.* The Texas Supreme Court noted her accusations that Father was the perpetrator as further evidence of endangerment. *See id.*

Mother presented evidence depicting her as someone without violent tendencies and unlikely to harm Carlo. Mother's psychiatrist testified that on the morning of February 24, she observed that Mother showed restlessness, fatigue, guilt, and helplessness, but she said those affects were common in new mothers. The psychiatrist described Mother as someone who had chronic depression and PTSD but showed no signs of being erratic or dangerous. Father and the Department put on no

14

evidence from a mental health practitioner about the state of Mother's mental health around the time of Carlo's injuries. However, Mother could have caused the injuries even if she had not been erratic or dangerous on the morning of February 24 and even if her diagnosed mental health conditions did not make her likely to harm Carlo. Mother also put on testimony from Burke—the person whose offer to help Mother had been rejected by Father—that Burke believed that Father had caused Carlo's injuries. Burke was one of the few witnesses at trial who knew Mother and Father in a personal capacity before Carlo's injuries but who was not related to or friends with either one.[8] However, the jury could have believed Burke's testimony about what Father said to her in her interaction with him and still disagreed with her opinion of who caused the injuries. Likewise, the jury did not have to believe Mother's testimony that she did not cause Carlo's injuries.

Other testimony presented by Mother, which painted her as someone unlikely to injure her child, is also not conclusive or direct evidence of what happened to Carlo:

- A former coworker testified that she had worked for Mother for three years, and even in stressful situations, she had never seen any anger or outbursts from Mother.

---

[8]Burke knew Mother and Father because she and her husband had sold Father the house where he and Mother were living at the time of Carlo's injuries.

- Another former coworker testified that even during stressful, twelve-hour workdays, she had never seen Mother act violently or hatefully toward people.

- Another witness who knew Mother professionally testified that in the time that she had known Mother, she had never known her to be manipulative or violent or to have angry outbursts.

- Grandfather testified that although Mother has had anxiety, he had never seen her get angry or show any type of violence because of that anxiety.

- Dr. Mara-Lysa Anthony, who had performed a psychological evaluation on Mother at the Department's request, testified about the assessment she conducted of Mother's attitudes related to parenting. Mother's scores ranged from average to above average, she did not demonstrate attitudes that are considered to indicate a higher risk of child mistreatment, and nothing in Dr. Anthony's report showed Mother was a danger to herself or to a child or caused concern about Mother's parenting ability.

- Tamu McKinney, a therapist who had provided counseling to Mother under a referral from the Department, testified that Mother exhibited appropriate emotions when talking to her about Carlo, and McKinney

opined that Mother did not have a mental illness that prevented her from parenting.

- Similarly, the chaplain at the hospital at which Carlo was treated testified that she met with Mother several times, and she found Mother's emotions to be appropriate and noticed nothing that caused the chaplain to be concerned that Mother could have been the person who had injured Carlo.

None of this evidence had a direct bearing on how Carlo was injured. *See H.R.M.*, 209 S.W.3d at 108; *Prosper Flor., Inc. v. Spicy World of USA, Inc.*, 649 S.W.3d 661, 671 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (discussing conclusive evidence and stating that unless the evidence is conclusive, the factfinder is entitled to weigh the evidence and to assess witness credibility). Further, regarding the absence of violent behavior by Mother in the past, Father also presented evidence that he was not prone to violence, and no evidence at trial showed that either parent had ever engaged in violence before. Thus, the evidence before the jury was that whichever parent committed the act, that behavior was an anomaly for that parent.

The jury had factually sufficient evidence from which it could determine that Mother caused Carlo's injury.[9] Further, it is undisputed that Mother blamed Father,

---

[9]The jury charge did not ask the jury to make a finding about who had caused the injury. However, the fact that the jury found that Mother's parental rights should be terminated and that Father's rights should not be terminated suggests that the jury likely believed Mother had been the one who injured Carlo.

and the Texas Supreme Court has said that her doing so is evidence of an endangering course of conduct. Accordingly, the jury had factually sufficient evidence from which to make the Subsection (E) finding. *See Z.N.*, 602 S.W.3d at 545. We overrule this part of Mother's first issue.

**B. Insufficient Evidence Supports the Best-Interest Finding**

Mother's first issue also challenges the best-interest finding. She argues that the evidence does not support the finding because

- Carlo had never been away from her before the Department became involved;

- Mother completed all her required services under her service plan and showed her willingness to do everything that the Department asked of her;

- Mother had a good support system and had no history of violence or substance abuse;

- Mother had adequate parenting skills;

- Mother was proactive in taking care of her mental health, and none of the multiple mental health providers who testified at trial saw any problem with her parenting Carlo;

- Mother knew and communicated with Carlo's medical providers;

18

- the CASA volunteer's assertion that Carlo was afraid of Mother was just speculation; and

- "[n]o one could identify who caused [Carlo's] injuries, and those who tried to admitted to speculation."

Because Mother challenges both the legal and factual sufficiency of the evidence supporting the best-interest finding, we review the relevant parts of the record under both standards. We begin by setting out the evidence relevant to best interest under the factors described in *Holley*. *See* 544 S.W.2d at 371–72.

**(1) The child's desires.**

Given Carlo's young age at the time of trial, there was no direct evidence of his desires regarding Mother's having parental rights. The Department, however, points to testimony of the CASA volunteer as evidence of Carlo's feelings about Mother. The CASA volunteer testified that before Carlo was mobile, he would cry in visits with Mother and push away from her, and the CASA volunteer believed the crying was caused by fear of Mother. The Texas Supreme Court cited this testimony as evidence that Mother had endangered Carlo. *C.E. II*, 687 S.W.3d at 314. The CASA volunteer believed that Carlo knew that Mother had caused his injury.

But if Carlo had been afraid of Mother at some point, the evidence does not show why or that it was based on her causing him injury or any of his other experiences with her. Carlo was injured when he was less than two months old, and

19

no evidence was presented at trial to show whether, at the time of the visits, he could have remembered his injury or how it had occurred.[10] The CASA volunteer testified about her education and experience, but that background did not establish her knowledge or expertise to support her opinion. Carlo's pediatrician testified but was not asked about the matter. From the context of her testimony, the CASA volunteer's opinion was based on mere speculation.

Further, we must consider all the evidence in our factual sufficiency review. Jada Green, the OCOK[11] "permanency specialist" (essentially, a caseworker) assigned to the case, testified that Carlo stopped crying during Mother's visits once he became more mobile. Further, the jury was shown video clips of Mother interacting with Carlo at visits, plus images from other visits, and in those images and video clips, Carlo was not crying or running away from Mother and exhibited no fear of her. To the contrary, the images show him playing with her and laughing. Thus, even if Carlo

---

[10]Indeed, if Carlo could remember being injured, one would have expected his fear to have begun immediately after the injuries occurred and continued through the time of his hospitalization, but there was no evidence that he showed any fear of Mother in that time period. His pediatrician saw him with Mother on February 25— the day after his injury, according to the Department—and she did not testify about Carlo showing fear or pulling away from Mother. Rather, the doctor stated that when she went into the room for the appointment, Mother was holding him, and during the appointment, he was smiling and not in any distress.

[11]OCOK, "Our Community Our Kids," is a private entity that contracts with the Department to provide foster care case management services. *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pet. denied) (mem. op.).

had acted afraid of Mother at some point—for whatever reason—the video clips and images showed that his behavior at her visits had changed. Additionally, although the CASA volunteer testified that during Mother's visits, she had seen Carlo display "behavior traits that were a pure act of frustration" and sometimes throw things in anger, she admitted that once Carlo became mobile, she also saw him happy and enjoying Mother's visits. She further acknowledged that in the videos played for the jury, she did not see Carlo running away or showing fear.

Further, the jury heard other evidence that either Green or Father's parents, who became Carlo's placement during the case, took actions that could have potentially interfered with Mother's relationship with Carlo. For example, when Carlo caught COVID-19 in September 2021, Father's parents offered him a virtual visit via Zoom but did not offer the same to Mother.[12] Further, until just a few weeks before trial, Father's parents were not providing updates about Carlo to be passed along to Mother at her visits. Father's mother claimed that before that time, she had not been told that she needed to do that. Green also did not provide any notice to Mother

---

[12]Additionally, the CASA volunteer would sometimes send pictures of Carlo at visits to Father but not to Mother. To explain why she did not send pictures to Mother, the CASA volunteer testified that in the past, Mother had made notes expressing strong disagreement with the Department staff's comments about what had occurred during some visits, and the CASA volunteer said that her and Mother's perception of those visits were so different that it "ma[de] no sense to try to have a productive communication with [Mother]." But the CASA volunteer also said that she and Mother always had civil interactions when they communicated, and she did not explain why sending Mother pictures of her visits with Carlo would need to involve "productive communication" implicating their different perspectives of situations.

when Carlo had his first haircut; Mother received no notice until after Carlo had received multiple haircuts.

Additionally, Mother had been bringing breast milk to visits to be passed to Father's parents to give to Carlo, but Father's mother stopped giving it to him. She claimed that Carlo's pediatrician had said to stop giving breast milk and to give him whole cow's milk instead, but his pediatrician testified at trial and denied saying that. The pediatrician testified that although Green had tried to get her to write a letter telling Mother to stop providing breast milk, she had declined because there was no medical reason to stop providing it to him. Green also acknowledged in her testimony that at the beginning of the case, there had been a request at a hearing to ask Mother to quit nursing Carlo, but the trial court refused to make that order. Green claimed that her request had been because of concerns about whether Mother's medications would interfere with Carlo's medications, but no trial testimony suggested that the Department acted on anything but speculation rather than medical advice when it made the request.

In summary, by the time of trial, Carlo did not appear afraid of Mother and appeared to enjoy her visits. The evidence regarding this factor does not support a finding that termination was in Carlo's best interest.

**(2) The parental abilities of the individuals seeking custody, the plans for the child by these individuals or by the agency seeking custody, and the stability of the home or proposed placement.**

Regarding Mother's parenting abilities, Holly Mizer, the Department's investigator, testified that at visits, Mother would sometimes put a headband on Carlo's head, including during a visit around St. Patrick's Day 2021, which was about a month after Carlo's head injury. Mizer described Mother's putting headbands on Carlo as "a questionable parenting decision." The Texas Supreme Court considered this testimony as evidence of endangerment, *C.E. II*, 687 S.W.3d at 313, and we will therefore consider it in our review of the best-interest finding, *see C.H.*, 89 S.W.3d at 28 (noting that the evidence establishing a termination ground may also be probative of best interest).

However, reviewing the record as a whole yields a different view of the situation. Mizer also testified that Mother would remove the headband after she had taken a picture of Carlo wearing it. Moreover, when asked if the headband was tight on Carlo's head, Mizer answered that she could not say for sure, that Carlo did not cry, and that she would have intervened if he had shown distress. The jury heard no evidence that the headband was tight on Carlo's head, that it caused him any pain or

discomfort, or that putting one on his head was dangerous. Indeed, Mizer agreed that Mother's placing a headband on Carlo's head "caused no harm or injury" to Carlo.[13]

No medical provider testified that Mother's briefly placing a headband on Carlo's head had any risk of causing him pain or injury. Carlo's pediatrician and the nurse who participated in his care in the hospital both testified, and neither the Department nor Father asked them any questions about whether the headbands could have hurt Carlo. The jury had some evidence that objects could touch Carlo's head without endangering him: the nurse involved in his treatment immediately after his injuries testified that he had EEG leads placed on his head when he was hospitalized. Thus, to conclude that the headband posed a risk, the jury would have needed more information, such as whether the headband sat tightly on his head or whether his head injury was of a kind that could be affected by placing something like a headband on his head.

Mizer also thought it odd that Mother wanted to take "lots" of pictures of her child. Mizer further thought it was suspicious that Mother "didn't show emotion" when being interviewed by law enforcement, but Carlo's pediatrician stated that Mother had been appropriately worried about Carlo, and witnesses at the hospital testified that Mother had been upset and "extremely distressed" by Carlo's injuries.

_____

[13]The Department's brief states that its staff "pleaded" with Mother to not put headbands on Carlo's head, but the record pages cited by the Department do not support that statement.

While Mizer was suspicious about Mother's calm demeanor during an interview, Mother was also criticized at trial for when she *had* shown emotion; Green testified that she found it odd that Mother appeared distressed by a video that Green had her watch that addressed the dangers of shaken baby syndrome.

The CASA volunteer testified that sometimes Mother could not soothe Carlo, that he cried for two hours during one visit, and that Mother would not accept advice on how to soothe him, and the jury could consider that testimony in evaluating Mother's parenting abilities. But the CASA volunteer also said that at other times, Mother could soothe Carlo. Mother stated that although she was a first-time mother, she had done a lot of research about reasons for babies crying and how to soothe them. She explained that before Carlo was taken into care, she used to soothe him by taking him for a walk around the neighborhood, but she could not do that during visits. Mother further testified about other things she would do to calm him, like sing to him, distract him with toys, hold him and bounce him, and play music, and the jury heard no testimony that these acts were inappropriate behaviors by Mother.

Green expressed concerns that at a visit, Mother gave Carlo small snacks and then let him run around the room, which Green stated was a choking hazard. Green stated that she did not believe that Carlo was actually going to choke during those visits but believed it to be a bad habit that should be discouraged. But Green further stated that after she provided Mother feedback about the issue, Mother began feeding Carlo in a highchair rather than letting him run around the room. Mother also testified

about switching to feeding him in a highchair so that he could not walk around while eating.

Green had other criticisms of Mother's parenting during visits—for example, once Mother had allowed Carlo to put a zip-top plastic bag in his mouth and did not remove it from him until she was told it could be a choking concern, at which time she moved it out of his view.[14] In another visit, Mother let him play with a necklace with a locket or pendant, which he put in his mouth. After Mother was advised that it could be a choking hazard, she distracted Carlo with a toy and removed the necklace, and Green acknowledged that Mother had never left Carlo alone with the necklace.

Green also had good things to say about Mother's parenting during visits. Green said that Mother "really d[id] a nice job on trying to interact with [Carlo] and get him to smile and get him to engage," "[brought] lots of toys and activities and a -- a ball tent fort that he [could] crawl into," and "provide[d] lots of food items for him to try." Green said that Carlo "often smile[d] and he like[d] to be chased," so "there [were] a lot of interactions. [Mother] ma[de] a lot of effort to interact with him."

Green expressed concern that, unlike Father, Mother was not a "natural" at parenting. According to Green, Mother struggled with knowing how to meet Carlo's needs "not just technically but also emotionally," and her improvements came after "very, very direct teaching." Mother recognized in her testimony that she lacked

_____

[14]Green's supervisor also attended that visit, and she testified that Carlo was not actually choking or in any distress.

26

knowledge in areas of parenting. However, McKinney, the clinical social worker who counseled Mother under her service plan, worked with Mother on parenting skills and discussed child development, among other things. Thus, Mother worked on improving her parenting skills during the proceedings. Further, even Green's testimony indicated that Mother could improve when taught.

Regarding Mother's ability to provide a stable home for Carlo, at the time of trial, Mother was employed as a veterinary surgeon and was living in a house. She had babyproofed her home and had spoken to several daycares. The CASA volunteer testified that she had been to Mother's home, that Mother had a room set up for Carlo, that Mother had all the appropriate child safety items in the home, and that she had no concerns that Mother's home would be an inappropriate living situation for him. *See A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 798 (Tex. App.—Austin 2023, no pet.) (considering in best-interest analysis that mother was employed and had stable housing).

As for support for Mother, Grandfather was planning to move to Florida, but until he did, he could provide support for her. Mother's aunts were also support for her, and Mother testified that she had "tons of family and friends [in the area] and in Houston." No evidence indicated that once Grandfather moved to Florida, Mother would be left without a support system.

27

In summary, there was no evidence that Mother cannot support Carlo or that her home was unsafe for him.[15] The CASA volunteer had concerns about Carlo's being afraid of Mother and Mother's inability to soothe Carlo, but by the time of trial, those concerns appeared to have been resolved. The Department had concerns about Mother's not being a "natural" parent and needing "very direct" coaching to improve, but Mother worked on her parenting skills during the case, and the Department witnesses acknowledged that although they still had concerns, Mother had improved.

**(3) The emotional and physical needs of the child now and in the future.**

Regarding Carlo's needs, at the time of trial, he was still being seen by specialists. Carlo's pediatrician testified that he had two abnormal health issues remaining. First, he had some "visual field defects with his peripheral vision," but his pediatric ophthalmologist believed that "all of that will resolve and be back to normal over the next few years." Second, he was having difficulty transitioning from purees to solid foods, so he was in feeding therapy. The pediatrician stated that Carlo was "meeting all of his developmental milestones appropriately."

---

[15]The jury also heard testimony regarding Father's parenting skills and his home, but in this case, the trial court did not terminate Father's rights, and so the trial court does not have to choose between the home provided by the foster parents and that of the biological parents or between one parent or the other. Thus, the stability of Father's home and Father's plans for Carlo could weigh in favor of giving Father primary custody, but they do not necessarily support a finding that termination of Mother's rights is in Carlo's best interest.

The Department's brief mentions Carlo's needing feeding therapy, and it asserts that Carlo needs a caregiver who knows his seizure plan.[16] The jury heard no evidence that if Mother does not know Carlo's current treatment plan or his seizure plan, she is incapable of learning it or following it.[17] Although Green testified that Mother is not a "natural" parent, no one testified that Mother is incapable of implementing medical advice for Carlo. To the contrary, Carlo's pediatrician testified that she had contact with both parents, that both parents had reached out to her in an appropriate manner, that they were both appropriately concerned for Carlo's health, and that they were both actively trying to ensure that he remained healthy. Before Carlo's injuries, Mother had asked appropriate questions at doctor's appointments, was appropriately concerned for Carlo's health, paid attention to details, and never tried to overrule the doctor's medical opinion.

---

[16]By the time of trial, Carlo was no longer on seizure medication. Maggie Ray, a permanency supervisor with OCOK, testified that Carlo has a "seizure plan," which as of trial had never needed to be used. The plan was "for the caregiver . . . to know basic first aid for a child having a seizure[,] such as don't restrain them[, and] . . . [i]f it goes beyond a certain amount of time . . . they may need to call the neurologist or an ambulance."

[17]Additionally, our disposition of this case does not necessarily require that Mother be appointed joint managing conservator or be designated as a parent who makes decisions regarding Carlo's health care.

29

**(4) The emotional and physical danger to the child now and in the future; the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and any excuse for the acts or omissions of the parent.**

As for acts that may indicate that the parent–child relationship is not a proper one, as noted above, we consider the endangerment evidence in our best-evidence analysis, and evidence that Mother caused Carlo's injuries is also evidence the jury could consider in deciding that the parent–child relationship between Mother and Carlo was not proper. That evidence is the strongest evidence supporting the best-interest finding. *Cf.* Tex. Fam. Code Ann. § 263.307(b)(3) (considering the magnitude of harm to the child as a best-interest factor in cases in which the child is placed under the Department's care). But just as one incident of endangering behavior is not enough to show endangerment under Subsection (E), one incidence of violence is not necessarily sufficient to show that termination is in the child's best interest.[18]

The evidence showed no pattern of violent behavior by Mother toward Carlo or anyone else. *Cf. id.* § 263.307(b)(3) (considering frequency and circumstances of harm to child in best-interest analysis.), (b)(7) (considering whether there is a history

---

[18]We note again that Father's texts established that he understood that Mother was suffering from some sort of mental health issue and further indicated that he was trying to cause her to have a breakdown, yet he still routinely left Carlo in her care for up to twelve hours a day. *C.E. I*, 692 S.W.3d at 496. If the Department believed that Mother's mental health conditions made her a danger to Carlo, then it should have also concluded that Father's behavior endangered Carlo. Nevertheless, the Department did not seek termination of Father's parental rights, suggesting that the Department agrees that termination might not be in a child's best interest even when a parent has endangered a child.

of abusive or assaultive conduct by the child's family). Indeed, the evidence does not show any other incident of violence by Mother toward any other person or herself[19] at any other point in her life, even around the time of the 2017 Facebook video that the Department and Father repeatedly played for the jury and in February 2021 when Mother was "in crisis" (and Father was gleefully telling his friends that she was on the verge of a breakdown).

When Mother was voluntarily hospitalized in 2017, a doctor at the facility executed a "Certificate of Medical Examination" in which he stated that he had diagnosed her as bipolar and opined that she "present[ed] a substantial risk of serious harm to self or others if not immediately restrained." However, the doctor who signed the certificate saw Mother for a short period and did not testify at trial, and Mother's medical records from the time were not offered at trial. Further, Mother was released from that hospitalization after a trial judge heard the evidence regarding Mother's mental health, determined that there was no probable cause to believe that she presented a substantial risk of serious harm to herself or to others, and ordered her released from confinement. That case was later dismissed.

---

[19]Susan Boles, a licensed professional counselor, who saw Mother for five sessions in 2020 and January 2021, testified that Mother had told her that her prior hospitalization was "in a treatment center for attempted suicide." However, the court records we have from Mother's hospitalization do not reflect a suicide attempt, and although Mother and Grandfather both testified about Mother's hospitalization, neither testified that Mother had attempted suicide.

Additionally, her psychiatrist, Dr. Diana Ghelber, testified at trial that Mother's appearance and statements in the Facebook video were most likely the result of Mother's PTSD[20] and that she did not appear to look angry or manic (as seen with bipolar disorder). Dr. Ghelber stated that Mother did not currently exhibit symptoms of PTSD. Dr. Anthony—the psychologist who conducted Mother's psychological evaluation for the Department—also stated that the video appeared to show panic rather than anger.

Father's attorney emphasized throughout trial that at Mother's 2017 hospitalization, she had been diagnosed with bipolar disorder, and the Department also raised that diagnosis in some of its questions. However, Dr. Ghelber disagreed with that diagnosis, and Dr. Anthony also declined to give that diagnosis. Dr. Ghelber described signs of the manic phase of bipolar disorder—"episodes of grandiosity, pressure of speech,[21] less need for sleep, more interested in sex/unprotected sex, spending sprees"—and there was no trial evidence connecting the general symptoms listed by Dr. Ghelber to any specific behavior by Mother. Dr. Ghelber diagnosed Mother with major depressive disorder, moderate, recurrent;

---

[20]As noted in our previous opinion, in the year or so leading up to her hospitalization, her boyfriend attempted to kill her, her dog died, she lost her job when her boss committed suicide, and her mother was diagnosed with cancer. *C.E. I.*, 692 S.W.3d at 493.

[21]There was no explanation of what "episodes of grandiosity" or "pressure of speech" looks like in a person.

PTSD; generalized anxiety disorder; and panic disorder. Dr. Ghelber said that when she saw Mother on February 24, Mother showed some signs of postpartum depression,[22] but she did not present as someone who posed a danger to herself or who needed hospitalization. Instead, she appeared restless, fatigued, and helpless.

Dr. Anthony stated that she would be surprised to learn that the Department was seeking termination on mental health grounds because there was nothing in her report that spoke to Mother's being a danger to herself or others or to a child. Dr. Anthony discussed the bias that exists regarding mental health and parenting: "[M]ental health issues are not generally well understood just by the general public and . . . it's more common for people to think that others who have significant mental health issues would have other problems like substance abuse or criminal activity or to be bad parents."

Dr. Ghelber stated that Mother's depression was in remission, she had "improved significantly" since she began seeing the doctor, and she was proactive about calling if she had problems. Dr. Anthony agreed that Mother's depression was in remission. She believed that Mother was managing her mental health and was aware of her mental health status.

Additionally, McKinney testified that although she had seen Mother be "angry and frustrated" in a session, it was "perfectly okay in terms of a clinical setting to feel

---

[22]On the other hand, Carlo's pediatrician stated that she never saw any signs of postpartum depression when Mother came to appointments prior to Carlo's injuries.

those feelings" and that Mother was not inappropriate "with how she responded to that." McKinney stated that Mother's frustration stemmed from being away from her son and her feeling "as though she was being treated differently than the other party by CPS."[23] Further, Mother was frustrated that she was not getting full access to information about Carlo—and trial testimony suggested that her feeling was based on facts. *See In re N.J.*, No. 05-23-00110-CV, 2023 WL 5198791, at *5 (Tex. App.—Dallas Aug. 14, 2023, no pet.) (mem. op.) (discussing father's becoming angry about the Department's actions during the case and because obtaining legal possession of his child took a long time and concluding that his anger was not an attribute of a parent endangering a child). McKinney testified that despite the frustration, Mother never acted inappropriately. McKinney saw Mother for nineteen sessions between May 2021 and December 2021 and opined that she did not have a mental illness that prevented her from parenting.

On the other hand, the Department presented testimony from Susan Boles, the licensed professional counselor; who saw Mother for several sessions in 2020 and January 2021. Boles thought that she had noticed in Mother "some of the speech patterns" and "a little bit of the manic kind of behavior" of bipolar disorder. But Boles did not explain what she meant by her reference to speech patterns or "manic

---

[23]As noted elsewhere in this opinion, the trial evidence indicates that Mother's perception that she was treated differently, whether for good reason or not, was accurate.

34

kind of behavior," did not describe what she observed, and admitted that she was not qualified to diagnose.

As noted, former coworkers testified that Mother handled stress well at work and that they had never seen any violent behavior from her. One coworker had worked with Mother for three years and never saw any anger or outbursts from her despite her working long, stressful hours. Further, even the Department's and Father's evidence that Mother said she was "going into crisis" around the time of Carlo's injury suggested that Mother had self-awareness regarding her mental state and was willing to accept medical care for her mental health issues.[24] Additionally, by the time of trial, Mother was no longer living with Father, and thus she was no longer exposed to the environment that had caused her so much anxiety nor living with someone rooting for her to have a mental breakdown. Indeed, texts between Mother and Grandfather in the weeks immediately preceding Carlo's injuries showed that her relationship with Father was a major source of her anxiety at that time. The texts indicated that she was worried about Father's pressuring her to sign a cohabitation agreement, losing her job at his clinic and consequently losing her health insurance, and the ending of her relationship with him.

---

[24]Father's brief argues that Mother minimized her need for mental health treatment. But the evidence shows the opposite. Mother voluntarily submitted herself to mental health treatment in 2017, she did so again in February 2021, and she continued seeing her psychiatrist throughout these proceedings. Further, Carlo's pediatrician stated that prior to Carlo's injuries, Mother had disclosed her mental health issues.

Moreover, Dr. Anthony's psychological evaluation states that Mother "did not demonstrate problematic attitudes that are considered to be high risk in terms of child mistreatment" in the areas that the evaluation assessed and that Mother "appear[ed] to have the cognitive ability to understand the appropriate developmental needs of children and alternative forms of discipline." *Cf.* Tex. Fam. Code Ann. § 263.307(b)(6) (including the results of a parent's psychological evaluation as a best-interest factor in cases in which children are placed under the Department's care).

In summary, no witness testified about other incidents of violence by Mother. Carlo's pediatrician testified that Mother was appropriately concerned for his health and was actively trying to ensure that he remained healthy. The Facebook video that Father and the Department emphasized and played repeatedly for the jury did not show violent behavior, and Mother's psychiatrist and the psychologist who evaluated her for the Department both testified that the video did not show anger.

Further, the Department and Father presented no testimony or other evidence connecting Mother's diagnosed mental health conditions to any specific act by Mother, no evidence of how those conditions specifically manifested in Mother, and no evidence of how those conditions, as presented by Mother, created a present or future danger to Carlo. Additionally, Mother presented testimony from multiple persons who had worked with her in stressful situations and who never saw violence or anger from her. The Department and Father introduced texts from Mother and Grandfather from around the time of Carlo's injuries showing that Mother had

expressed feeling elevated levels of anxiety, and this evidence showed Mother's awareness of her mental state. The trial evidence also showed her willingness to accept mental health care, and she no longer lived with someone who hoped for her to have a mental breakdown.

**(5) Other Relevant Consideration.**

The jury heard other evidence contrary to the best-interest finding. Mother completed all of her services. *Cf. id.* § 263.307(b)(10) (considering a parent's willingness to accept counseling services); *A.S.*, 665 S.W.3d at 798 (considering parent's completion of services in best-interest analysis). The jury saw videos and images of Mother's visits with Carlo in which she was interacting with him appropriately, and he appeared to be enjoying his interactions with her.

We note that Green sometimes testified in a manner that created a false impression regarding Mother or her defense.[25] For example, Green implied with her

---

[25]The Department's brief has similar complications. The brief states several times that Mother was hospitalized on February 10, 2021, suggesting that Mother had been committed then for mental health issue, when in fact she went to the hospital for screening and was released with medication that same day. The Department also misleadingly states twice that McKinney, Mother's therapist during the case stated that Mother was "guarded and wasn't very open" or receptive to therapy, when in fact the therapist testified that Mother was guarded initially, but she eventually opened up, and the two had a successful therapeutic relationship. The Department points to Dr. Ghelber's testimony that "sometimes moms, they have obsessive thoughts to hurt the baby, but they do not have intentions to hurt the baby," and in context, the Department's brief appears to suggest that Dr. Ghelber was saying that Mother had those kinds of thoughts. But Dr. Ghelber offered that testimony in discussing screening questions she asked in her first appointment with Mother to check for postpartum depression, and she explained that sometimes a mother will have such

37

testimony that Mother—unlike Father—had delayed having her psychological evaluation. But cross-examination revealed that the delay in Mother's evaluation was largely due to Green's failure to complete all the paperwork required for the referral, limited availability for in-person appointments,[26] and the cancellation of Mother's original appointment after the provider contracted COVID-19. Green also testified that she did not timely get notes from Dr. Ghelber regarding Mother's visits, and the context of her testimony implied that Dr. Ghelber had been delinquent in providing the information. But on cross-examination, Green admitted that Dr. Ghelber had sent the notes soon after Green requested them and that the delay in requesting them caused the delay in receiving them.

Additionally, the CASA volunteer appeared to have developed a bias against Mother at the beginning of the case after hearing during a status conference that as soon as Mother left the hospital after Carlo was taken into care, she went directly to get a massage and a pedicure. But the CASA volunteer made no attempt to verify that

worries but those worries are not "congruent" with her behavior. Dr. Ghelber did not testify that Mother had such obsessive thoughts.

[26]Dr. Anthony, who conducted the evaluation, testified that she preferred in-person evaluations over telehealth appointments because "there's more opportunity to observe the client, their behavior, how they interact with you." The doctor who conducted Father's psychological evaluation testified that she also prefers doing evaluations in-person because "[t]here's a different sense you get about a person when they're sitting right in front of you." Father's evaluation was conducted via a telehealth appointment.

what she had heard was true.[27] Relatedly, some of the CASA volunteer's criticisms appeared to have no real basis. For example, she testified that in early visits, Mother would nurse, but it appeared that Carlo was only pacifying rather than nursing because he would take a bottle of formula afterwards. It concerned the CASA volunteer that "he was really just pacifying." But then she later admitted that this was an example of Mother's soothing Carlo and that there was actually no problem with it. The CASA volunteer also acknowledged that she had never discussed with any of Carlo's doctors whether it was an issue that he was nursing and then taking a bottle of formula. Other evidence suggests that Carlo's pediatrician was fine with Carlo's nursing and then taking formula; Father testified that before Carlo was taken into care, the pediatrician had told Mother that because Carlo was struggling to nurse and was losing weight, the parents should give him formula after nursing.

Of course, it is the jury's role to resolve inconsistencies in a witness's testimony. *C.E. II*, 687 S.W.3d at 308. But we point out these issues as relevant to Mother's perception that she was treated differently than Father. The evidence indicates that Mother's perception was factually based and provides an explanation for Mother's apparent distrust of Department staff.

---

[27]The CASA volunteer conceded that she could not have been certain that it was true and had not asked Mother about it. Mother acknowledged at trial that, at the encouragement of her support network, she had a hair appointment about a week after she had left the hospital, but she denied going for a pedicure or massage and denied having any kind of "self-care" appointment right after she left the hospital.

**(6) Conclusion Regarding Best-Interest Finding.**

Viewing the evidence in the light most favorable to the trial court's finding, *see id.*, we conclude that the evidence is legally sufficient to support a finding that termination of Mother's parental rights was in Carlo's best interest. *See E.C.R.*, 402 S.W.3d at 249 (noting that evidence probative of a termination ground may also be probative of best interest); *In re C.K.C.*, No. 14-23-00498-CV, 2024 WL 5250477, at *12 (Tex. App.—Houston [14th Dist.] Dec. 31, 2024, no pet.) (mem. op. on reh'g) (considering in best-interest analysis parent's failure to accept responsibility for endangering substance abuse problem and to take any steps to remediate it); *see also C.E. I*, 692 S.W.3d at 514–15 (discussing the multiple hostile emails that Mother sent to Carlo's ad litem during trial proceedings, which showed questionable judgment on Mother's part at a time when she knew that her parental rights were at stake). However, considering the record as a whole, we conclude that the evidence was factually insufficient to support the best-interest finding.

To summarize, the jury could find that Mother had caused Carlo's injuries. However, there was no pattern of violent behavior by Mother. Indeed, there was no evidence of any prior violent behavior by Mother at all. The jury was presented with evidence that around the time of Carlo's injuries, Mother had been overwhelmed and anxious and that Father was a major source of that anxiety; in addition to the usual difficulties of parenting a newborn, Mother had increased anxiety from the potential loss of her partner, job, insurance, and home, all of which were tied to her

40

relationship with Father. The jury was also presented with evidence strongly suggesting that Father was aware of Mother's state; that rather than help her, he was trying to trigger a breakdown; and that, despite Father's awareness of Mother's mental state, he left her alone with Carlo for up to twelve hours a day.

The jury further heard evidence that although Mother strongly disliked receiving feedback from the Department staff on her parenting abilities and viewed the Department as being against her, she nevertheless did make corrections to her parenting, and she completed all of her services. The jury had evidence and testimony that in early visits, Mother could have difficulty soothing Carlo, sometimes for an hour or more. But the jury also heard evidence that by the time of trial, Mother's visits with Carlo had much improved. Mother had prepared her home for Carlo, had a job, and had a support system.

The Department's and Father's case in this proceeding leaned heavily on their concerns about Mother's having mental health conditions. The Department and Father strongly suggested that those conditions led Mother to injure Carlo and that he could not be safe with her because of those conditions.[28] However, the Department

---

[28]As stated, the Department and Father repeatedly raised the fact that Mother had a prior diagnosis of bipolar disorder by the doctor who oversaw her 2017 hospitalization. The Department and Father did not bring any mental health expert qualified to diagnose bipolar disorder to testify about how the disorder manifests, if Mother's behavior suggests that disorder, or, if she had the disorder, that it might or how it might affect her ability to parent. They also did not put on testimony from any mental health practitioner that any of Mother's other diagnosed mental health conditions made her a danger to Carlo or otherwise unfit to parent him.

and Father provided little evidence to link Mother's diagnoses with danger to Carlo—that is, rather than present any evidence regarding Mother's specific mental health conditions, how the conditions manifested, and whether or how those conditions created a danger to Carlo, they implied that because Mother had mental health conditions, she necessarily must be dangerous. In fact, the Department's attorney asserted at trial that under the law, Mother's having a mental health diagnosis was, on its own, a legally sufficient basis on which to terminate her parental rights. But that is not correct, *see* Tex. Fam. Code Ann. § 161.003, and Dr. Ghelber, Dr. Anthony, and McKinney all testified about Mother's mental health, and not one of them testified that Mother's mental health made her a present or future danger to Carlo or that her rights should be terminated.

We sustain this part of Mother's first issue and remand for a new trial on best interest. *See In re R.R.A.*, No. 14-22-00217-CV, 2024 WL 3944217, at *4 (Tex. App.—Houston [14th Dist.] Aug. 27, 2024, no pet.) (mem. op.).

### C. Conservatorship

Mother's first issue further argues that "no or insufficient evidence exists to not name Mother a managing or possessory conservator of the child." The trial court terminated Mother's parental rights and did not make any separate finding as to conservatorship. *Contra In re J.A.J.*, 243 S.W.3d 611, 613 (Tex. 2007) (addressing judgment under which trial court terminated mother's parental rights and also

separately found that appointment of mother as managing conservator would not be in child's best interest).

Unlike termination decisions, conservatorship decisions are made under a preponderance of the evidence standard. *Id.* at 616 (citing Tex. Fam. Code Ann. § 105.005); *In re J.D.*, No. 02-24-00404-CV, 2025 WL 52128, at \*16 (Tex. App.—Fort Worth Jan. 9, 2025, no pet.) (mem. op.). If a trial court does not terminate a parent's parental rights, the trial court has discretion to set restrictions on the parent's possession of or access to the child. *See* Tex. Fam. Code Ann. §§ 153.006, 153.131, 153.193, 161.205; *In re J.J.R.S.*, 627 S.W.3d 211, 220 (Tex. 2021) (noting that in rare cases, a severe restriction or limitation on a parent's possession of a child is permissible if it is in the best interest of the child and upholding order that left mother's access to children to discretion of managing conservators); *In re A.M.T.*, 592 S.W.3d 974, 978 (Tex. App.—San Antonio 2019, pet. denied) (upholding order in termination proceeding that denied termination, appointed grandparents as managing conservators, and appointed parents as possessory conservators). A conservatorship decision must be based on the best interest of the child, and courts apply the *Holley* factors in making that decision. *See In re S.T.*, 508 S.W.3d 482, 490 (Tex. App.—Fort Worth 2015, no pet.).

When this case was previously before this court, we remanded it to the trial court to determine whether Mother should be named as conservator. *C.E. I*, 692 S.W.3d at 517. We noted that because the Department and Father were primarily

43

focused on terminating Mother's parental rights, and Mother's focus was on preserving her parental rights and on terminating Father's, the record was not adequately developed as to whether, if Mother's rights were not terminated, she should be appointed as Carlo's conservator. *Id.* We further pointed out that although the jury found that Father should be named as sole managing conservator, it did not address possessory conservatorship. *Id.* (citing *In re F.E.N.*, 579 S.W.3d 74, 77 (Tex. 2019) (stating that remand was necessary when record did not support termination and record was not adequately developed as to conservatorship)). Finally, we noted that the trial court's judgment terminated Mother's rights without separately addressing conservatorship as to Mother. *Id.*

Because the trial court did not make any conservatorship decision as to Mother separate from its termination ruling, reversal of the termination necessarily puts the question of Mother's conservatorship back at issue. *See Colbert v. Dep't of Family & Protective Servs.*, 227 S.W.3d 799, 816 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *cf. In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (explaining denial of petition for review in *Colbert* and stating that when trial court did not make separate conservatorship findings under Family Code Section 153.131 and the only mechanism for the Department's appointment as conservator was as a consequence of termination, parent's challenge to the conservatorship appointment was subsumed in her appeal of the termination order). Because we are reversing the termination as to Mother, we must also reverse the trial court's failure to resolve the conservatorship as

to Mother. We once again remand the issue to the trial court. *See Colbert*, 227 S.W.3d at 816 (noting that when an appellate court reverses a termination order, the court is not in a position to determine whether "to render some other order in the best interest of the child" and that "[c]ircumstances concerning the child or parent may have changed since the trial court rendered its order of termination, a matter that requires a factfinder").

## Conclusion

Having overruled the parts of Mother's first issue challenging the factual sufficiency of the evidence supporting the Subsection (E) endangerment finding and the legal sufficiency of the evidence supporting the best-interest finding and having sustained the part of Mother's first issue challenging the factual sufficiency of the best-interest finding, we reverse the trial court's judgment of termination and remand for a new trial to determine whether termination of Mother's parental rights is in Carlo's best interest and, if Mother's rights are not terminated, to decide whether to appoint Mother as a managing or possessory conservator.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: April 24, 2025

45